## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ) | Case No. 1:01CV01537 |
| SIERRA CLUB ) | (consolidated with |
|     Plaintiff, ) | Case No. 1:01CV01548 |
| ) | Case No. 1:01CV01558 |
|     v. ) | Case No. 1:01CV01569 |
| ) | Case No. 1:01CV01578 |
| STEPEHEN L. JOHNSON,[1] ) | Case No. 1:01CV01582 |
| Administrator, ) | Case No. 1:01CV01597) |
| U.S. Environmental Protection Agency ) | |
|     Defendant. ) | Judge Paul L. Friedman |

### MOTION OF SIERRA CLUB FOR SUMMARY JUDGMENT

Plaintiff Sierra Club hereby moves this Court for summary judgment pursuant to Fed. R. Civ. P. 56. Sierra Club is entitled to summary judgment as a matter of law, and there is no genuine issue as to any material fact.

Sierra Club respectfully requests that the Court declare that the failure of defendant Johnson to take the following actions constitutes "a failure of the Administrator to perform any act or duty under this chapter that is not discretionary with the Administrator" within the meaning of Clean Air Act § 304(a)(2), 42 U.S.C. § 7604(a)(2):

1. promulgate emission standards for the categories of area sources of hazardous air pollutants listed pursuant to Clean Air Act §§ 112(c)(3) and 112(k)(3)(B), 42 U.S.C. § 7412(c)(3), (k)(3)(B);
2. promulgate emission standards under Clean Air Act § 112(d)(2) or (d)(4) assuring that sources accounting for ninety percent of the aggregate emissions of the persistent and bioaccumulative hazardous air pollutants enumerated in Clean Air Act § 112(c)(6), 42 U.S.C. § 7412(c)(6), are subject to such standards with respect to these pollutants; and,

---

[1] Under Rule 25(d)(1), current Administrator Stephen L. Johnson is automatically substituted for former Administrator Michael O. Leavitt.

3. promulgate regulations or control techniques guidelines for the categories of smog-causing consumer and commercial products listed pursuant to Clean Air Act § 183(e), 42 U.S.C. § 7511b(e).

Sierra Club further requests that the Court order EPA to take the overdue actions enumerated above by the dates set forth in the accompanying proposed order.

DATED:        May 11, 2005

                                        Respectfully submitted,


                                        _____/S/_____
                                        James S. Pew
                                        (D.C. Bar # 448830)
                                        Earthjustice
                                        1625 Massachusetts Ave., N.W.
                                        Suite 702
                                        Washington, D.C.  20036-2212
                                        (202) 667-4500

                                        Attorney for Plaintiff
                                        Sierra Club

# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| SIERRA CLUB | ) Case No. 1:01CV01537 |
| Plaintiff, | ) (consolidated with |
| | ) Case No. 1:01CV01548 |
| | ) Case No. 1:01CV01558 |
| v. | ) Case No. 1:01CV01569 |
| | ) Case No. 1:01CV01578 |
| STEPEHEN L. JOHNSON,[1] | ) Case No. 1:01CV01582 |
| Administrator, | ) Case No. 1:01CV01597) |
| U.S. Environmental Protection Agency | ) |
| Defendant. | ) Judge Paul L. Friedman |

## STATEMENT OF SIERRA CLUB OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

Plaintiff Sierra Club submit the following issue of material facts as to which there is no material issue:

1.  Defendant (hereinafter "EPA" or "the agency") has not issued standards for the following categories of area sources of hazardous air pollutants:[2]

1) Steel Foundries;

2) Stainless and Nonstainless Steel Manufacturing EAF;

3) Flexible Polyurethane Foam Production;

4) Industrial Boilers;

5) Secondary Nonferrous Metals;

6) Iron Foundries;

7) Primary Nonferrous Metals - Zn, Cd, Be;

8) Paint and Allied Products;

---

[1] Under Rule 25(d)(1), current Administrator Stephen L. Johnson is automatically substituted for former Administrator Michael O. Leavitt.

[2] Two of the categories listed in paragraph 1, "Other Solid Waste Incineration" (21) and "Sewage Sludge Incineration" (40) are solid waste incineration units within the meaning of Clean Air Act § 129(g), 42 U.S.C. § 7429(g), and therefore must be regulated under Clean Air Act § 129 rather than § 112. Sierra Club maintains that the partial consent decree in the present action already requires EPA to issue § 129 standards for these categories.

9) Plastic Parts and Products (Surface Coating);

10) Pressed & Blown Glass & Glassware Manufacturing;

11) Plating and Polishing;

12) Agricultural Chemicals & Pesticides Manufacturing;

13) Industrial Inorganic Chemicals Manufacturing;

14) Fabricated Plate Work;

15) Clay Ceramics Manufacturing;

16) Cyclic Crude and Intermediate Production;

17) Chemical Preparations;

18) Paint Stripping Operations;

19) Auto Body Refinishing;

20) Institutional/Commercial Heaters;

21) Other Solid Waste Incineration;

22) Oil And Natural Gas Production;

23) Hospital Sterilizers;

24) Gasoline Distribution Stage 1;

25) Stationary Internal Combustion Engines;

26) Acrylic Fibers/Modacrylic Fibers Production;

27) Miscellaneous Organic Chemical Manufacturing (Mon);

28) Industrial Organic Chemicals Manufacturing;

29) Plastic Materials And Resins Manufacturing;

30) Synthetic Rubber Manufacturing;

31) Lead Acid Battery Manufacturing;

32) Secondary Copper Smelting;

33) Ferroalloys Production: Ferromanganese And Silicomanganese;

34) Primary Copper (Not Subject To Primary Copper Smelting Mact);

35) Pharmaceutical Production;

36) Copper Foundries;

37) Iron And Steel Forging;

38) Valves And Pipe Fittings;

39) Flexible Polyurethane Foam Fabrication Operations;

40) Sewage Sludge Incineration;

41) Wood Preserving;

42) Asphalt Processing And Asphalt Roofing Manufacturing;

43) Carbon Black Production;

44) Industrial Machinery And Equipment: Finishing Operations;

45) Electrical And Electronic Equipment: Finishing Operations;

46) Fabricated Metal
    Products, Nec;

47) Fabricated Structural
    Metal Manufacturing;

48) Heating Equipment,
    Except Electrical;

49) Inorganic Pigments
    Manufacturing;

50) Nonferrous Foundries,
    Nec;

51) Prepared Feeds
    Manufacturing;

52) Primary Metals Products
    Manufacturing;

53) Brick And Structural
    Clay Products
    Manufacturing;

54) Chemical Manufacturing:
    Chromium Compounds;
    and,

55) Polyvinyl Chloride And
    Copolymers Production.

2.    EPA has not promulgated emission standards under Clean Air Act
§§ 112(d)(2) or (d)(4) assuring that sources accounting for ninety percent of the
aggregate emissions of polychlorinated biphenyls, dioxins, furans, mercury, polycyclic
organic matter, hexachlorobenzene, and alkylated lead compounds are subject to such
standards with respect to these pollutants.

3.    EPA has not issued regulations or control techniques guidelines for the
following categories of consumer and commercial products:

1)  Flexible Package Printing
    Materials;
2)  Aerosol Spray Paints;
3)  Industrial Cleaning
    Solvents;
4)  Flat Wood Paneling
    Coatings;
5)  Lithographic Printing
    Materials;
6)  Paper, Film and Foil
    Coatings;
7)  Letterpress Printing
    Materials;
8)  Plastic Parts Coatings;

9)  Metal Furniture Coatings;
10) Auto and Light Duty
    Truck Coatings;
11) Petroleum Dry Cleaning
    Solvents;
12) Miscellaneous Metal
    Products Coatings;
13) Large Appliance
    Coatings;
14) Fiberglass Boat
    Manufacturing Materials;
    and,
15) Miscellaneous Industrial
    Adhesives.

DATED:        May 11, 2005

Respectfully submitted,

_____/S/_____
James S. Pew
(D.C. Bar # 448830)
Earthjustice
1625 Massachusetts Ave., N.W.
Suite 702
Washington, D.C.  20036-2212
(202) 667-4500

Attorney for Plaintiff
Sierra Club

**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SIERRA CLUB,<br>Plaintiff,<br><br>v.<br><br>STEPHEN L. JOHNSON,<br>Administrator,<br>Environmental<br>Protection Agency,<br>Defendant. | Civil Action No. 01cv1537 PLF |

**MEMORANDUM IN SUPPORT OF PLAINTIFF SIERRA CLUB FOR SUMMARY JUDGMENT**

James S. Pew
D.C. Bar. No. 448830
Earthjustice
1625 Massachusetts Avenue, NW
Washington, D.C.
(202) 667-4500

*Attorney for Sierra Club*

DATED:  May 11, 2005

# TABLE OF CONTENTS

TABLE OF CONTENTS......................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................... iii

GLOSSARY .......................................................................................................................... v

MEMORANDUM IN SUPPORT OF MOTION OF
PLAINTIFF SIERRA CLUB FOR SUMMARY JUDGMENT....................................................1

INTRODUCTORY STATEMENT ...........................................................................................1

I.      THE CLEAN AIR ACT AMENDMENTS OF 1990 ......................................................1

II.     EPA'S FAILURE TO ISSUE THE REQUIRED STANDARDS ......................................4

        A.      EPA's Failure To Issue The Required Area Source Standards
                And The Resulting Adverse Public Health And Environmental Effects...............4

                1.      Failure To Issue Standards.........................................................4

                2.      Adverse Public Health and Environmental Effects ....................................5

        B.      EPA's Failure To Issue The Required Standards For Persistent And
                Bioaccumulative Toxics And The Resulting Adverse Public Health And
                Environmental Effects ..........................................................................7

                1.      Failure To Issue Standards.........................................................7

                2.      Adverse Public Health And Environmental Effects ....................................7

        C.      EPA's Failure To Issue The Required Standards For
                Consumer And Commercial Products And The Resulting
                Adverse Health And Environmental Effects..........................................................9

                1.      Failure To Issue Standards.........................................................9

                2.      Adverse Public Health And Environmental Effects ..................................10

III.    RELIEF REQUESTED.......................................................................................11

SUMMARY OF ARGUMENT ...............................................................................................12

ARGUMENT .......................................................................................................................12

I.      THIS COURT SHOULD COMPEL EPA TO ISSUE THE
        OVERDUE AREA SOURCE STANDARDS ................................................................12

II.     THIS COURT SHOULD COMPEL EPA TO ISSUE THE OVERDUE
        STANDARDS FOR PERSISTENT BIOACCUMULATIVE TOXICS ...........................15

III.    THIS COURT SHOULD COMPEL EPA TO ISSUE THE OVERDUE
        STANDARDS FOR CONSUMER AND COMMERCIAL PRODUCTS .......................16

# TABLE OF AUTHORITIES

## FEDERAL CASES

*ALA v. Reilly,*
962 F.2d 258 (2nd Cir. 1992)..........................................................................14

*Cement Kiln Recycling Coalition v. EPA,*
255 F.3d 855 (D.C. Cir. 2001)...........................................................................3

*National Lime Association v. EPA,*
233 F.3d 625 (D.C. Cir. 2000)........................................................................3, 7

*Public Citizen Health Research Group v. Brock,*
823 F.2d 626, 627 (D.C. Cir. 1987).................................................................18

*Sierra Club v. Thomas,*
828 F.2d 783 (D.C. Cir. 1987).........................................................................14

## FEDERAL REGISTER NOTICES

60 Fed. Reg. 15264 (March 23, 1995).............................................4, 10, 11, 16
63 Fed. Reg. 17838 (April 10, 1998)................................................................16
64 Fed.Reg. 13422 (March 18, 1999).......................................10, 11, 17, 18
64 Fed. Reg. 38706 (July 19, 1999).....................................................6, 13, 14
65 Fed. Reg. 6698 (February 10, 2000).............................................................11
66 Fed. Reg. 5002 (January 18, 2001).......................................................10, 11
67 Fed. Reg. 70427 (November 22, 2002)........................................................13
69 Fed. Reg. 73786 (December 13, 2004).........................................................13

## STATUTES

42 U.S.C. § 7408.............................................................................................18
42 U.S.C. § 7412...............................................................................................5
42 U.S.C. § 7412(a)...........................................................................................2
*42 U.S.C. §7412(c).........................................................1, 3, 5, 7, 12, 13, 16
42 U.S.C. § 7412(d) ....................................................................................3, 15
42 U.S.C. § 7412(e) ................................................................................2, 14, 15
42 U.S.C. § 7412(k).....................................................................................1, 3
42 U.S.C. § 7429(a)(1)(B)-.............................................................................14
*42 U.S.C. § 7511b(e) .........................................................1, 4, 10, 17, 18
42 U.S.C. § 7604(a) .........................................................................................11

## LEGISLATIVE HISTORY

H.R. Rep. 101-490, at 151 (1990), *reprinted in* Committee on Environment and
Public Works, S. Rep. No. 103-38, <u>A Legislative History of the Clean Air Act
Amendments of 1990</u> (1993) 3175 .........................................................................2, 3

S. Rep. No. 101-228, at 127, 154 (1989), *reprinted in* Committee on
Environment and Public Works, S. Rep. No. 103-38, <u>A Legislative History of
the Clean Air Act Amendments of 1990</u> (1993) 8467, 8494 ....................................2, 3

**GLOSSARY**

| | |
|---|---|
| CTGs | control techniques guidelines |
| GACT | Generally Available Control Technology |
| HAPs | hazardous air pollutants |
| HCB | hexachlorobenzene |
| MACT | Maximum Achievable Control Technology |
| PCBs | polychlorinated biphenyls |
| POM | polycyclic organic matter |
| VOCs | volatile organic compounds |

**MEMORANDUM IN SUPPORT OF MOTION OF PLAINTIFF SIERRA CLUB**
**FOR SUMMARY JUDGMENT**

Plaintiff Sierra Club submits this memorandum in support of its motion for

summary judgment.  The present case seeks to compel defendant Stephen L. Johnson

(hereinafter, "EPA" or "the agency") to take the following actions:

1.  promulgate emission standards for the categories of area sources of hazardous
    air pollutants listed pursuant to Clean Air Act §§ 112(c)(3) and 112(k)(3)(B),
    42 U.S.C. § 7412(c)(3), (k)(3)(B);
2.  promulgate emission standards under Clean Air Act § 112(d)(2) or (d)(4)
    assuring that sources accounting for ninety percent of the aggregate emissions
    of the persistent and bioaccumulative hazardous air pollutants enumerated in
    Clean Air Act § 112(c)(6), 42 U.S.C. § 7412(c)(6), are subject to such
    standards with respect to these pollutants; and,
3.  promulgate regulations or control techniques guidelines for the categories of
    smog-causing consumer and commercial products listed pursuant to Clean Air
    Act § 183(e), 42 U.S.C. § 7511b(e).

EPA had a nondiscretionary duty to take these actions, and the relevant statutory

deadlines have expired.

## INTRODUCTORY STATEMENT

## I.      THE CLEAN AIR ACT AMENDMENTS OF 1990.

In the Clean Air Act Amendments of 1990, Congress took extraordinary steps to

protect public health and the environment from hazardous air pollutants — substances

like mercury, lead, dioxins and polychlorinated biphenyls (PCBs) that can cause cancer

and other serious adverse health effects.  The Amendments reflect Congress' keen

awareness of the threat posed by these pollutants (also known as "HAPs" or "air toxics")

and frustration with EPA's decades-long failure to address it:

> In the 20 years since [the 1970 Clean Air Act] was enacted, EPA has acted
> to establish standards under section 112 for seven hazardous air pollutants.
> This is only a small fraction of the many substances associated (at some

level of concentration) with cancer, birth defects, neurological damage, or other serious health effects.

***

EPA has estimated that emissions of toxic air pollutants may cause some 1,600 to 3000 cancer cases a year.  Numerous studies, including EPA's July 1989 "Analysis of Air Toxics Emissions, Exposures, Cancer Risks, and Controllability in Five Urban Areas" suggest that area wide lifetime access cancer risks from urban air toxics may range from about 1 in 10,000 to 1 in 1,000, and that cancer incidence may range from 1 to 23 excess cases per year per million population.  These are exceptionally high levels of risk.

***

Toxic emissions can also cause an array of serious illnesses besides cancer.  These include birth defects, damage to the brain or other parts of the nervous system, reproductive disorders, and genetic mutations.

H.R. Rep. 490, 101st Cong., 2nd Sess. at 151-154 (1990), *reprinted in* Committee on Environment and Public Works, S. Rep. 38, 103rd Cong, 1st Sess. <u>Legislative History of the Clean Air Act Amendments of 1990</u> (1993) ("Legislative History") at 3175-3178. *See also* S. Rep. No. 228, 101st Cong., 1st Sess. at 127-129, 154-155 (1989), Legislative History at 8467-8469, 8494-8495.

Key among the Act's new provisions was a highly detailed schedule pursuant to which EPA was required to set emission standards.  For "major" sources of hazardous air pollutants — *i.e.*, those with the potential to emit at least ten tons per year of any single HAP or twenty-five tons per year of any combination of HAPs, 42 U.S.C. § 7412(a)(1) — Congress enacted a phased regulatory schedule beginning with the issuance of emission standards for forty categories of sources within two years and ending with the issuance of standards for all categories within ten years.  42 U.S.C. § 7412(e)(1).  For "area" sources of HAPs — i.e., all sources that are not "major," 42 U.S.C. § 7412(a)(2) — Congress set just two deadlines.  First, Congress required EPA to list "sufficient categories or subcategories of area sources to ensure that area sources representing 90

2

percent of the area source emissions of the 30 hazardous air pollutants that present the greatest threat to public health in the largest number of urban areas are subject to regulation under this section" by November 15, 1995.  42 U.S.C. §§ 7412(c)(3), 7412(k)(3)(B).  Second, Congress required EPA to issue emission standards for all the listed area source categories by November 15, 2000.  *Id.*

Congress was especially concerned with HAPs such as PCBs that, once emitted, persist in the environment and accumulate as they move up the food chain.  Legislative History at 8493-8495 (Senate Report); *id.* at 3343-3346 (House Report).  Accordingly the 1990 Amendments also required EPA to assure that sources accounting for ninety percent of the aggregate emissions of seven such pollutants (PCBs, dioxins, furans, mercury, polycyclic organic matter (POM), hexachlorobenzene (HCB) and alkylated lead compounds) were subject to emission standards under § 112(d)(2) or § 112(d)(4) with respect to such pollutants.  42 U.S.C. § 7412(c)(6).[1]  Again, Congress set deadlines.  It required EPA to: (1) list the categories accounting for ninety percent of the enumerated HAPs by November 15, 1995; and (2) assure that these categories were subject to standards with respect to such HAPs no later than November 15, 2000.  *Id.*

---

[1] Emission standards under § 112(d)(2), often referred to as "maximum achievable control technology" or "MACT" standards, must reflect the "maximum" achievable degree of reduction in emissions of each of the hazardous air pollutants that a category emits.  42 U.S.C. § 7412(d)(1), (d)(2).  *See National Lime Association v. EPA*, 233 F.3d 625, 633-634 (D.C. Cir. 2000) (in setting MACT standards, EPA has a "clear statutory obligation to set emission standards for each listed HAP").  In addition, to satisfy the minimum stringency ("floor") requirements in § 112(d)(3), EPA's MACT standards must, for each HAP, at least match the average emission levels achieved by the relevant best performing sources.  42 U.S.C. § 7412(d)(3).  *See Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 861-862, 865 (D.C. Cir. 2001).

Finally, the 1990 Amendments included many important new measures to control smog-forming ozone.  Among these was the requirement to control a significant contributor to ozone formation, the volatile organic compounds (VOCs) emitted by consumer and commercial products.  42 U.S.C. § 7511b(e).  *See* 42 U.S.C. § 7511b(e)(1)(B) (defining "consumer and commercial product" to mean "any substance, product (including paints, coatings, and solvents), or article (including any container or packaging) held by any person, the use, consumption, storage, disposal, destruction, or decomposition of which may result in the release of volatile organic compounds").  The 1990 Amendments required EPA to list categories accounting for eighty percent of VOC emissions from consumer and commercial products, to divide the list into four groups, and regulate one group of categories every two years after promulgating the list.  42 U.S.C. § 7511b(e)(3)(A).  Because EPA published its listing of consumer and commercial product categories on March 23, 1995 (60 Fed. Reg. 15267), the agency's regulations for each of the four groups of categories were due on March 23, 1997, 1999, 2001 and 2003 respectively.  *Id.*

## II.    EPA'S FAILURE TO ISSUE THE REQUIRED STANDARDS.

### A.    EPA's Failure To Issue The Required Area Source Standards And The Resulting Adverse Public Health And Environmental Effects.

#### 1.    Failure To Issue Standards.

Although the Clean Air Act required EPA to issue all of its area source standards no later than November 15, 2000, the agency has issued less than one quarter of these standards.  Specifically, EPA has identified seventy categories of area sources that must be regulated to meet the ninety percent requirement in § 112(c)(3) but, to date, has issued

standards for only fifteen.  Thus, more than four years after the statutory deadline

expired, <u>fifty-five of the seventy categories remain uncontrolled.</u>[2]

### 2.    Adverse Public Health And Environmental Effects.

When it enacted the Clean Air Act Amendments of 1990, Congress found

> that emissions of hazardous air pollutants from area sources may
> individually, or in the aggregate, present significant risks to the public
> health in urban areas.  Considering the large number of persons exposed
> and the risks of carcinogenic and other adverse health effects from
> hazardous air pollutants, ambient concentrations characteristic of large
> urban areas should be reduced to levels substantially below those currently
> experienced.

42 U.S.C. § 7412(k).  Subsequent analysis from EPA backs up Congress' concern.  Area

sources not only tend to be located in densely populated areas, they contribute just as

much to the total national emissions of hazardous air pollutants as major sources.  EPA,

National Air Quality and Emissions Trends Report (1999) ("1999 Air Trends Report,"

excerpts attached as Ex. 1 hereto) at 82.[3]  Further, area sources are "the largest overall

contributor (40 percent)" to emissions of the thirty-three HAPs that EPA determined to

"present the greatest threat to public health in the largest number of urban areas are

subject to regulation under this section" ("Urban HAPs"), 42 U.S.C. § 7412(c)(3) —

dwarfing the nine percent contribution by major sources.  1999 Air Trends Report at 82-

83.  For example, area sources contribute more than half of all cadmium emissions, more

---

[2] Of those fifty-five categories, six are subject to the partial consent decree signed by this
Court on May 22, 2003:  Other Solid Waste Incineration; Oil and Natural Gas
Production; Hospital Sterilizers; Gasoline Distribution Stage I;  and, Stationary Internal
Combustion Engines.

[3] EPA has issued far less comprehensive air trends reports in the years following 1999
but, so far, has used the same emissions data from 1996.  *See, e.g.*, EPA, National Air
Quality Emissions Trends Report (2003) (excerpts attached as Ex. 2 hereto) at 64.

than seventy percent of all PCBs emissions, and more than eighty percent of all POM emissions.  *Id.* at 83.

In addition, as EPA has pointed out, many of the toxic emission sources in urban areas are area sources, and their emissions "are more likely to be released at ground level, where people are more likely to be exposed to them."  64 Fed. Reg. 38706, 38712/1 (July 19, 1999).  In these same urban areas, people tend to be exposed to many different hazardous air pollutants emitted by many different sources.  *Id.* at 38711/1-2.  "This is particularly important because even in cases where individual pollutant levels are low enough that exposure to any one pollutant wouldn't be expected to pose harm, some pollutants may work together such that their potential for harm increases and exposure to the mixture poses harm."  *Id.* at 38711/2.

Not surprisingly, the risks created by area sources' toxic emissions are substantial. For almost the entire American population, the lifetime cancer risk from "area and other sources" <u>alone</u> — excluding the risk from major sources and mobile sources — is over 1/1,000,000.  EPA, National Air Toxics Assessment, 1996 Risk Characterization http://www.epa.gov/ttn/atw/nata/rcharts/figure02.pdf, Ex. 3 hereto at 2-3.  For many Americans, the lifetime cancer risk from area sources' emissions is even greater: over 1/100,000 for one hundred million Americans and over 1/10,000 for almost 1,000,000 Americans.  *Id.*  The levels of non-cancer risks from area sources are similar.  *Id.* at 4-5.

**B.**   **EPA's Failure To Issue The Required Standards For Persistent And Bioaccumulative Toxics And The Resulting Adverse Public Health And Environmental Effects.**

**1.**   **Failure To Issue Standards.**

Despite the unambiguous mandate in § 112(c)(6), 42 U.S.C. § 7412(c)(6), EPA has failed to issue §112(d)(2) or (d)(4) standards assuring that sources accounting for ninety percent of the aggregate emissions of PCBs, dioxins, furans, mercury, POM, HCB, and alkylated lead compounds ("§ 112(c)(6) HAPs") are subject to standards with respect to such pollutants.  For example, EPA has not issued any PCBs standards for any of the categories that emit PCBs.  All of the standards required by § 112(c)(6) were due more than four years ago, by November 15, 2000.  42 U.S.C. § 7412(c)(6).[4]

**2.**   **Adverse Public Health And Environmental Effects.**

The adverse health and environmental effects caused by the persistent and bioaccumulative pollutants enumerated in Clean Air Act § 112(c)(6) are significant. Even in 1990, Congress recognized that air emissions of such pollutants was causing a long term buildup of toxics in water, soil, wildlife, and food supplies.  Legislative History at 8493-8495.  Since then, EPA has confirmed the danger repeatedly.  In its first Great Waters Report to Congress under Clean Air Act § 112(m), for example, EPA identified all of the 112(c)(6) pollutants as pollutants of concern for the nation's "Great Waters" (the Great Lakes, Lake Champlain, Chesapeake Bay, and coastal waters).  EPA,

---

[4] The Clean Air Act does not prohibit EPA from using surrogates to regulate hazardous air pollutants where it is appropriate and reasonable to do so.  For example, the agency has sometimes used particulate matter (PM) as a surrogate for certain metals that are hazardous air pollutants.  *See National Lime Ass'n*, 233 F.3d at 637-640.  EPA, however, has not purported to meet § 112(c)(6)'s ninety percent requirement for PCBs through either or surrogate emission standards.

Deposition of Air Pollutants to the Great Waters, First Report to Congress (1994) ("1st

Great Waters Report, Ex. 4 hereto) at 19.  As the agency explained, these pollutants

persist in the environment and can travel great distances.  *Id.* at Executive Summary p. ix.

They also accumulate in animal tissue, and "magnify up the food web, with each level

accumulating the toxics from its diet and passing the burden along to the next level of the

food web."  *Id.* at Executive Summary pp. ix-x.  As EPA further explained

> Top consumers in the food web, usually consumers of large fish, may
> accumulate chemical concentrations many millions of times greater than
> the concentrations present in the water.  As a result of unsafe
> concentrations of chemicals in fish, due to biomagnification, fish
> consumption advisories have been issued in hundreds of waterbodies
> nationwide, including the Great Lakes.  High-risk groups, which fish
> consumption advisories are established to protect, include breast-feeding
> mothers because breast-fed babies continue to accumulate from their
> mothers after birth.  For example, they can have PCB levels four times
> higher than their mothers after 6 to nine months of breast-feeding.  Other
> groups at high risk are subpopulations such as sport anglers, Native
> Americans, and the urban poor, who tend to have high fish consumption.

*Id.* at Executive Summary p. x.

In addition to cancer, the § 112(c)(6) pollutants can cause other serious adverse

health effects including: "reproductive effects, developmental effects (i.e., effects on the

developing human, including effects on embryos, fetuses, and children), neurological

effects (i.e., effects on the brain and nervous system), effects on the endocrine system

(e.g., effects on hormone synthesis and function), and other noncancer effects (e.g., liver

or kidney damage)."  *Id.* at 32-33.  Studies in the United States have shown that prenatal

exposure to PCBs, for example, can cause "motor abnormalities" at birth and deficits in

mental ability later in life.  *Id.* at 34.

The § 112(c)(6) pollutants pose grave risks not only to human health but to the

environment and humans' ability to enjoy it.  In 2003, all of the Great Lakes and their

connecting waters, seventy-one percent of America's coastal waters, thirty-five percent of the Nation's total lake acres and twenty-four percent of its total river miles were subject to fish advisories for toxic substances.  EPA, Fact Sheet, National Listing of Fish Advisories (2004), Ex.5 at 2.  There are specific fish advisories for dioxins and PCBs for all the five Great Lakes, and a mercury advisory for four of them.  *Id.* at 3.  Thirty-one States have statewide fish advisories for PCBs or mercury.  *Id.* at 4.  States also have issued fish advisories for polyaromatic hydrocarbons (a subset of polycyclic organic matter) and HCB.  *Id.* at 5. Underscoring the ability of toxics to work their way up the food chain, some States also have issued advisories for other wildlife; New York, for example, has issued a statewide advisory for waterfowl.  *Id.*  EPA itself has indicated that the Florida panther, wood stork, as well as populations of loons, eagles, mink and otter all are at "high risk of mercury exposure and effects."  EPA, Mercury Study Report to Congress (1997), Ex. 6 hereto, at 0-3.  *See also id.* at 3-43 – 3-46.  Similarly, dangerous levels of PCBs have been found in orcas and beluga whales.  M.L. Lyke, *Toxin Threatens a Wonder of the Northwest*, Washington Post, Nov. 8, 1999 Ex. 7 hereto.

C.      **EPA's Failure To Issue The Required Standards For Consumer And Commercial Products And The Resulting Adverse Health And Environmental Effects.**

1.      **Failure To Issue Standards.**

In plain violation of the Clean Air Act, EPA has failed to issue standards for the following three groups of categories of consumer and commercial products:

Group 2 (due by March 23, 1999)
Flexible Package Printing Materials

Group 3 (due by March 23, 2001)
Aerosol Spray Paints
Industrial Cleaning Solvents
Flat Wood Paneling Coatings
Lithographic Printing Materials

Group 4 (due by March 23, 2003)
Paper, Film and Foil Coating
Letterpress Printing Materials
Plastic Parts Coatings
Metal Furniture Coatings
Auto and Light Duty Truck Coatings
Petroleum Dry Cleaning Solvents
Miscellaneous Metal Products Coatings
Large Appliance Coatings
Fiberglass Boat Manufacturing Materials
Miscellaneous Industrial Adhesives

EPA's duty to issue standards for these categories was triggered when the agency

published its initial listing of categories, pursuant to Clean Air Act § 183(e)(3)(A) on

March 23, 1995 (60 Fed. Reg. 15267).  EPA subsequently revised its listing in 1999 to

put off the bulk of its standards by moving them into the latest possible grouping.  64

Fed. Reg. 13422, 13424 (March 18, 1999).  Even under EPA's revised schedule,

however, the standards enumerated above are all between two and six years overdue.


**2.      Adverse Public Health And Environmental Effects.**

Ozone, a principal component of urban smog, is a severe lung irritant even to

healthy adults.  66 Fed. Reg. 5002, 5012/3 (January 18, 2001).  It can cause shortness of

breath, chest pains, increased risk of infection, aggravation of asthma, and significant

decreases in lung function.  *Id.*  Elevated ozone levels have been linked to increased

hospital admissions and emergency room visits for respiratory causes.  65 Fed. Reg.

6698, 6707/1 (February 10, 2000).  Ozone presents a special health risk to small children,

the elderly, persons with lung ailments, and adults who are active outdoors.  64 Fed. Reg.

at 13423.  In the Washington, D.C. area alone, populations at risk from ozone pollution

include:

- 736,000 children under the age of 13;

- 225,700 asthmatics, including 53,200 children with asthma;

- 210,000 people with other chronic or persistent respiratory diseases, such as chronic bronchitis and emphysema;

- 336,000 people over the age of 65; and

- 185,000-370,000 otherwise health individuals who are especially sensitive to ozone.

Metropolitan Washington Council of Governments, State Implementation Plan (SIP)

Revisions (February 3, 2000), Excerpts attached as Ex. 8 hereto.  EPA has determined

that "[c]onsumer and commercial products, while individually small sources of VOC

emissions, contribute significantly to the ozone nonattainment problem.  In 1990,

consumer and commercial products emitted approximately 6 million tons of VOC

nationwide, or about 28 percent of all man-made VOC."  60 Fed. Reg. at 15265/3.

## III.     RELIEF REQUESTED.

Sierra Club respectfully requests that this Court find and declare that EPA's

failure to take the actions described above and in Sierra Club's complaints constitute

failures "to perform an act or duty under this chapter which is not discretionary with the

Administrator" within the meaning of 42 U.S.C. § 7604(a)(2).  Sierra Club further

requests that the Court order EPA to issue its overdue standards by the dates provided in

the proposed order submitted herewith.

## SUMMARY OF ARGUMENT

This is a suit to compel EPA to promulgate public health and environmental standards that are now long overdue.  Each additional day that EPA fails to issue these standards compounds the agency's violation of unambiguous Clean Air Act mandates, and prolongs and increases the exposure of Sierra Club members and other Americans to harmful air pollution.

Where EPA violates statutory deadlines, the agency must not be allowed to continue to place its own policy objectives before its overdue statutory obligations; rather, it must be compelled to meet those obligations as expeditiously as possible.  Here, the text of the Clean Air Act demonstrates Congress' conviction that EPA can complete all of tasks at issue in the present action within a two year time period.  Therefore, Sierra Club respectfully requests that the Court order EPA to take the actions that the Clean Air Act requires according to the highly achievable two and three year schedules set forth in the accompanying proposed order.

## ARGUMENT

## I.   THIS COURT SHOULD COMPEL EPA TO ISSUE THE OVERDUE AREA SOURCE STANDARDS.

EPA's course of conduct with respect to area source standards shows a pattern of consistent disregard for the law, disrespect for Congress, and indifference to the threat of serious and widespread adverse health effects that the agency's own reports have documented.  The Clean Air Act required EPA, by November 15, 1995, to list "sufficient categories or subcategories of area sources to ensure that area sources representing 90 percent of the area source emissions of the 30 most hazardous air pollutants that present

the greatest threat to public health in the greatest number of urban areas…"  42 U.S.C.

§ 7412(c)(3).  Nonetheless, EPA did not provide any listing until 1999 — after being

compelled to do so by this Court.  *Sierra Club v. EPA*, No. 95-1747 (HHG), June 2, 1997

Consent Decree, Ex. 9 hereto.  Then, the agency did not complete its list until November

22, 2002 — seven years after the Clean Air Act's five-year deadline had expired and

more than three years after the deadline in this Court's consent decree had expired.  67

Fed. Reg. 70427, 70428/2-3 (November 22, 2002).

EPA has been equally dismissive of the Clean Air Act's November 15, 2000

deadline for issuing the required area source emission standards.  42 U.S.C. § 7412(c)(3).

In its 1999 listing notice, EPA bluntly stated its intention to delay issuance of the required

area source standards until 2009, almost a decade after that deadline would expire.  64

Fed. Reg. 38706, 38725/1 (July 19, 1999).  Since then, EPA has fallen even further

behind.  Although EPA stated that, by 2004, it would issue area standards for at least the

thirteen area source categories that it listed in 1999 (64 Fed. Reg. at 38725/1), the agency

has failed to meet even that modest goal; ten of these thirteen categories are still

unregulated.  To make matters even worse, EPA's most recent regulatory agenda

indicates that the agency has no area source standards scheduled for promulgation, just

two standards scheduled for proposal, and has identified only twelve of the fifty-five

overdue standards as "long-term action[s]" for which the even the first scheduled

regulatory action "will take place after October 2005."  69 Fed. Reg. 73786, 73787/2-3,

73791-73796 (December 13, 2004).

Congress' intent in enacting the deadlines in Clean Air Act § 112(c)(3) could not

be clearer: to ensure that EPA completed all area source standards no later than

November 15, 2000.  42 U.S.C. § 7412(c)(3).  That intent must be given effect.  Thus,

EPA now must be compelled to issue its overdue standards for area sources — not when

it is convenient for the agency to issue them, not when the current administration's

competing policy objectives leave time and resources for EPA to issue them, but as soon

as they possibly can be issued.  "[W]hen, as here, a statute sets forth a bright-line rule for

agency action, such as in 42 U.S.C. § 7409(d)(1) ('Not later than December 31, 1980, and

at five-year intervals thereafter, the Administrator shall complete a thorough review * *

*.'), there is no room for debate — Congress has prescribed a categorical mandate that

deprives EPA of all discretion over the timing of its work."  *ALA v. Reilly*, 962 F.2d 258,

263 (2nd Cir. 1992) (*citing Sierra Club v. Thomas*, 828 F.2d 783, 791 (D.C. Cir. 1987))

(emphasis added).

　　　　The text of the Clean Air Act shows Congress' conviction that EPA could issue

standards for scores of categories of major sources of hazardous air pollutants in the

space of a few years.  For example, the Act required the agency to issue MACT standards

for forty categories of major sources within two years, by November 15, 1992.  42 U.S.C.

§ 7412(e)(1)(A).  Within those same two years, it also required EPA to issue virtually

identical standards for all large municipal waste combustors (MWC), all small MWC and

all medical waste incinerators (MWI).  42 U.S.C. § 7429(a)(1)(B)-(C).

　　　　The task of issuing fifty-five overdue area source standards is considerably less

demanding.  The agency has indicated that for "most" of the currently unregulated area

source categories, it intends to issue "generally available control technology" (GACT)

rules under § 112(d)(5), rather than MACT rules under § 112(d)(2).  64 Fed. Reg. at

38723/3. ("[w]hile we may develop MACT standards for some area sources, we expect

most sources will be subject to GACT standards"). As EPA itself makes clear (at 64 Fed.

Reg. at 38723/2), issuing GACT rules is considerably simpler than issuing MACT rules;

whereas § 112(d)(2) and (3) requires a two-step standard-setting process for each HAP

that a category emits, *see supra* at n.1, § 112(d)(5) merely requires the agency to issue a

single set of technology-based standards for an entire category. 42 U.S.C. § 7412(d)(5).

Further, EPA has stated its intention to make the process even quicker and simpler by

issuing just one "flexible" GACT rule for groups of "several area source categories" at

once. *Id.*

Moreover, EPA is not starting the area source rulemaking process from scratch.

EPA now has more than a decade of experience in writing air toxics rule and, more than a

year ago, the agency indicated that it had "started" twenty-two area source rules and

planned to start another eight. EPA, Air Toxics Program, April 14, 2004, Ex. 10 hereto at

19.

In short, even if EPA were starting from scratch and issuing full fledged MACT

rules for every one of the fifty-five overdue area source categories, a schedule requiring

the agency to do so in thirty-three months would be entirely consistent with the Clean Air

Act's directive to complete MACT rules for forty major source categories in twenty-four

months, 42 U.S.C. 7412(e)(1)(A). Therefore, the schedule proposed herewith by Sierra

Club — which establishes a staggered schedule allowing EPA thirty-six months to

complete a significantly shorter and simpler task on which the agency already has made

significant progress — is eminently achievable.

**II.     THIS COURT SHOULD COMPEL EPA TO ISSUE THE OVERDUE STANDARDS FOR PERSISTENT BIOACCUMULATIVE TOXICS.**

Although Clean Air Act § 112(c)(6) plainly establishes the regulation of persistent and bioaccumulative toxics as a top priority, EPA's priorities have, equally plainly, been different than those of Congress.  EPA has never "assur[ed]" that sources accounting for at least ninety percent of the emissions of the § 112(c)(6) HAPs are subject to standards with respect to such HAPs, even though the Act expressly required the agency to provide such assurance no later than November 15, 2000.  42 U.S.C. § 7412(c)(6).  In particular, EPA has never issued <u>any</u> § 112(d) standards for PCBs emissions from <u>any</u> source category.

EPA claimed in 1998 that ninety percent of the § 112(c)(6) pollutants are being emitted by source categories that already are subject to § 112(d) standards at least with respect to <u>some</u> HAPs (albeit not necessarily the § 112(c)(6) HAPs).  63 Fed. Reg. at 17846, 17849-17851.  If that claim is true, the agency can satisfy § 112(c)(6) simply by adding emission standards for specific § 112(c)(6) HAPs into a small number of already-existing MACT standards.  Alternatively, if already-regulated source categories do not account for ninety percent of the emissions of each of the § 112(c)(6) HAPs, the agency may have to set MACT standards for a discrete number of currently unregulated categories of area sources — sources for which § 112(c)(3) already requires the agency to set either MACT or GACT standards anyway.  *See supra* at 12-15.  As explained above, Congress determined that two years sufficed for EPA to set MACT standards for forty categories of major sources.  *Id.  A fortiori*, it will suffice for either of these far less demanding tasks that EPA must perform to satisfy its overdue obligations under § 112(c)(6).

**III.    THIS COURT SHOULD COMPEL EPA TO ISSUE THE OVERDUE STANDARDS FOR CONSUMER AND COMMERCIAL PRODUCTS.**

The Clean Air Act required EPA to establish standards for consumer and commercial products in three separate groupings, by March 23, 1999, March 23, 2001, and March 23, 2003 respectively.  42 U.S.C. § 7511b(e); 60 Fed. Reg. at1 5267.  EPA now has missed these deadlines by six, four, and two years.

The rulemaking task that the Clean Air Act establishes for consumer and commercial products is not demanding.  Unlike § 112(d), § 183(e) does <u>not</u> require: (1) the establishment of emission standards for each pollutant emitted; (2) the calculation of minimum stringencies ("floors"); or (3), the determination of the maximum achievable degree of reduction through a combination of all potential reduction measures.  At most, § 183(e) requires EPA to set a single standard reflecting the "best available controls."  42 U.S.C. § 7511b(e)(3)(A).  However, EPA may opt instead for the even less demanding approach of setting "controls techniques guidelines" (CTGs), if it determines that CTGs will be substantially as effective as regulations.  42 U.S.C. § 7511b(e)(3)(C).  *Compare* 42 U.S.C. § 7408(b) (describing CTGs) *with* 42 U.S.C. § 7511b(e)(1)(A) (defining "best available controls").

Issuing regulations or CTGs for the fifteen categories of consumer and commercial products is a substantially smaller task than issuing § 112(d) MACT rules for forty categories of major sources of air toxics.  Because Congress already has determined that two years is ample time for the latter task, it also is more than enough time for EPA to complete its statutory obligations under Clean Air Act § 183(e).  It bears emphasis that — just as with EPA's obligations to issue area source standards under § 112(c)(3) and standards for persistent bioaccumulative HAPs under § 112(c)(6) — the agency is not

starting from scratch.  It has already issued CTGs for the categories of consumer and

commercial products in its first grouping, *see* 64 Fed. Reg. at 13424, and has had several

years since then to prepare to issue regulations or CTGs for the remaining groupings.

## CONCLUSION

As the Court of Appeals has observed:

> We … understand, because we have seen it happen time and time again,
> that action Congress has ordered for the protection of public health all too
> easily becomes hostage to bureaucratic recalcitrance, factional infighting,
> and special interest politics.  At some point, we must lean forward from
> the bench to let an agency know, in no uncertain terms, that enough is
> enough.

*Public Citizen Health Research Group v. Brock*, 823 F.2d 626, 627 (D.C. Cir. 1987)

(ordering OSHA to issue regulation controlling workplace exposure to ethylene oxide).

EPA should be declared in violation of the Clean Air Act, and should be ordered

to promulgate its long-overdue emission standards according to the schedule described

above and set forth in the accompanying proposed order.

DATED:        May 11, 2005

Respectfully submitted,

_____/S/_____
James S. Pew
(D.C. Bar # 448830)
Earthjustice
1625 Massachusetts Ave., N.W.
Suite 702
Washington, D.C.  20036-2212
(202) 667-4500

Attorney for Plaintiff
Sierra Club