UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
SIERRA CLUB,                            )
                                        )        Civil Action No. 01-1537 (PLF)
            Plaintiff,                  )        (consolidated with
                                        )        Civil Action No. 01-1548
      v.                                )        Civil Action No. 01-1558
                                        )        Civil Action No. 01-1569
STEPHEN L. JOHNSON, Administrator,      )        Civil Action No. 01-1578
   United States Environmental          )        Civil Action No. 01-1582
   Protection Agency,[1]                )        Civil Action No. 01-1597)
                                        )
            Defendant.                  )
_____)


OPINION

        This case concerns defendant EPA's failure to discharge fully its duty under the

1990 Clean Air Act amendments to promulgate regulations governing the discharge of certain

hazardous air pollutants.  EPA does not deny that it has failed in its duty to promulgate these

regulations by the deadlines set in the statute; the only dispute concerns the schedule under which

the Court should order EPA to discharge its statutory duty.  On March 31, 2006, the court issued

an Order denying defendant's motion for summary judgment; granting plaintiff's motion for

summary judgment; declaring that defendant Steven L. Johnson's failure to take certain

regulatory actions constituted "a failure of the Administrator to perform any act or duty under

this chapter that is not discretionary with the Administrator" within the meaning of

_____

        [1]      Under Rule 25(d)(1) of the Federal Rules of Civil Procedure, EPA Administrator
Stephen L. Johnson has been substituted as defendant for former Administrator Michael O.
Leavitt.

Section 304(a)(2) of the Clean Air Act, 42 U.S.C. § 7604(a)(2); and ordering the EPA to fulfill

its statutory duties under Sections 112(c)(3), 112(k)(3)(B), 112(c)(6), and 183(e) on a prescribed

schedule.  The Court also denied plaintiff's motion to strike the declaration of Steve Page filed

by defendant in support of its motion for summary judgment.  This Opinion explains the

reasoning underlying that Order.

## I.  BACKGROUND

### A.  1990 Clean Air Act Amendments

On November 15, 1990, Congress enacted sweeping revisions to the Clean Air

Act.  See Pub. L. No. 101-549, 104 Stat. 2399 ("the Act").  Title III of the revised statute created

a complex scheme for the regulation of 189 specified hazardous air pollutants ("HAPs"), and

directed EPA to identify the sources of those pollutants and to promulgate regulations governing

the emission of HAPs from those sources.  Congress by statute added to the Clean Air Act the

list of pollutants to be regulated, minimum stringency requirements, and (most important for this

case) regulation deadlines.  It did so because it believed that EPA had failed to regulate enough

HAPs under previous air toxics provisions.  See Nat'l Lime Ass'n v. EPA, 233 F.3d 625, 634

(D.C. Cir. 2000).  The Senate Committee Report states:  "The [air toxics] law has worked poorly.

In 18 years, EPA has regulated only some sources of only seven chemicals. . . . The legislation

reported by the Committee would entirely restructure the existing law, so that toxics might be

adequately regulated by the Federal Government."  S. REP. NO. 101-228, at 128 (1989);  see also

H.R. REP. NO. 101-490, pt. 1, at 322 (1990) ("Since 1970, EPA has listed only eight substances

as hazardous air pollutants . . . and has promulgated emissions standards for seven of them.").

Title III of the Clean Air Act recognizes two basic kinds of air pollution "sources."  A "major source" is "any stationary source or group of stationary sources located within a contiguous area and under common control that emits . . . 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants."  42 U.S.C. § 7412(a)(1).  Major sources are subject to regulation under Section 112(d) of the Act, 42 U.S.C. § 7412(d).  An "area source" is "any stationary source of hazardous air pollutants that is not a major source."  42 U.S.C. § 7412(a)(2).[2]  The Act calls upon EPA to list the "source categories" most responsible for emissions of each HAP listed in the statute.  Source categories include, for example, steel foundries, industrial boilers, clay ceramics manufacturing, and asphalt processing and asphalt roofing manufacturing.[3]  After listing these source categories, EPA is required to promulgate regulations governing their emission of HAPs.

The Act also enacted new provisions regarding the emission of Volatile Organic Compounds ("VOCs" or "ozone precursors"), a major contributor to ground-level ozone pollution (smog).  VOCs are a component of automobile exhaust, and also are emitted in the fumes from products like oil-based paints and solvents.  Among other things, the Act calls upon EPA to promulgate regulations or "control techniques guidelines" for VOC-emitting consumer and commercial products that determined to contribute to ozone pollution in areas where ground-level ozone exceeds regulatory limits.

---

[2]     Mobile sources of air pollutants (i.e. vehicles) are regulated by Title II of the Clean Air Act.

[3]     Because one source may emit numerous pollutants, a single source category may be among the major source or area source categories listed for several HAPs.

At issue in this case are three mandatory duties imposed on EPA by the 1990 Clean Air Act amendments, which the agency admits it has failed to discharge fully. These duties are to:

1.      <u>Regulate area sources of 30 most dangerous HAPs</u>:  Sections 112(c)(3) and (k)(3)(B) of the Clean Air Act, 42 U.S.C. § 7412(c)(3) & (k)(3)(B), require the EPA to: (1) "identify not less than 30 hazardous air pollutants which, as the result of emissions from area sources, present the greatest threat to public health in the largest number of urban areas"; (2) identify the categories or subcategories of sources "accounting for 90 per centum or more of the aggregate emissions of each of the 30 identified hazardous air pollutants" within 5 years from the date of the statute's enactment (<u>i.e.</u> by November 15, 1995); and (3) issue emissions standards for those source categories within 10 years from the date of the enactment of the amendment (by November 15, 2000).

EPA has fulfilled the first two of these duties. It issued the list of area source categories in 1999. <u>See</u> 64 Fed. Reg. 38,706 (July 9, 1999); Defendant's Statement of Facts ¶ 2. The list has since been revised several times, but currently contains 70 area source categories. EPA has promulgated emission standards for only 15 of these 70 categories. <u>See</u> Declaration of Steve Page ("Page Decl.") ¶ 15; Defendant's Statement of Facts ¶ 2.

After lodging a draft consent decree with the Court for solicitation of public comment, the parties executed and filed a Revised Partial Consent Decree May 22, 2003. <u>See</u> Revised Partial Consent Decree (May 22, 2003) ("Consent Decree"). The Consent Decree requires EPA to promulgate standards for six further categories under Section 112(c)(3) and

(k)(3)(B).  See Page Decl. ¶ 19.[4]  EPA has taken final action on one of these categories (mercury

cell chlor-alkali plants); the deadlines under the Consent Decree for the remaining five sources

range from November 30, 2005 to December 20, 2007.  See id.

Accordingly, EPA must issue regulations for 55 remaining source categories

under Section 112(c)(3) and (k)(3)(B), five of which are accounted for in the Consent Decree.

See Page Decl. ¶ 24; Statement of Sierra Club of Material Facts as to Which There is no Genuine

Dispute ¶ 1.

2.      Regulate areas sources of statutorily-specified HAPs:  Section 112(c)(6) of

the Act also calls for the regulation of area sources of seven specific HAPs, without regard to

their inclusion on EPA's list of the 30 most dangerous HAPs.[5]  EPA's duties with respect to

HAPs listed under this provision are identical to its duties with respect to the 30 most dangerous

HAPs under Sections 112(c)(3) and 112(k)(3)(B):  to (1) identify the categories or subcategories

of sources "accounting for 90 per centum or more of the aggregate emissions of each such

[listed] pollutant" by November 15, 1995; and (2) issue emissions standards for those source

categories by November 15, 2000.  42 U.S.C. § 7412(c)(6).

EPA issued the list of source categories under Section 112(c)(6) in 1998, see 63

Fed. Reg. 17,838 (April 10, 1998), but later modified the list to remove five source categories.

See 67 Fed. Reg. 68,124 (Nov. 8, 2002); Page Decl. ¶ 16-17.  The current list contains 50 source

---

[4]      Two of these six categories are also source categories that must be regulated under
Section 112(c)(6).

[5]      The seven HAPs listed are alkylated lead compounds, polycyclic organic matter,
hexachlorobenzene, mercury, polychlorinated biphenyls, 2,3,7,8-tetrachlorodibenzofurans and
2,3,7,8-tetrachlorodibenzo-p-dioxin.  42 U.S.C § 7412(c)(6).

categories.  Between 1990 and 2003, EPA promulgated emissions standards for about 30 of these source categories, because those source categories were "major sources" of HAPs also subject to regulation under Section 112(d).  See id. ¶ 18.

Under the Consent Decree, EPA agreed to promulgate standards for two further source categories under Section 112(c)(6).  EPA has taken final action on emissions standards for mercury cell chlor-alkali plants (also a source category regulated under Section 112(c)(3) and (k)(3)(B)); it must promulgate a final rule with regard to the last category, gasoline distribution facilities, by December 20, 2007.  See Consent Decree at 5-6.

EPA therefore must regulate four Section 112(c)(6) source categories beyond the one it already is bound by the Consent Decree to regulate before a date certain.  See Page Decl. ¶ 25.  These five source categories, however, are also among the 50 source categories that must be regulated under Section 112(c)(3) and (k)(3)(B).  See Page Decl. ¶ 28.

3.     Regulate products that emit VOCs:  Section 183(e) of the Act, 42 U.S.C. § 7511b(e), calls on EPA to "conduct a study of the emissions of volatile organic compounds into the ambient air from consumer and commercial products" in order to "determine their potential to contribute to ozone levels" that violate EPA limits on ambient ozone levels, and to "establish criteria for regulating consumer and commercial products . . . which shall be subject to control under this subsection."  42 U.S.C. § 7511b(e)(2)(A).  After completing the study, EPA is to: (1) list the categories of products that account for 80 percent or more of VOC emissions in areas that violate EPA ambient standards for ozone; (2) divide the list into four priority categories, based on specified criteria; and (3) every two years after the list is promulgated,

regulate one group of categories, until all four categories are regulated.  42 U.S.C.
§ 7511b(e)(3)(A).

Under Section 183(e), EPA may enact "any system or systems of regulation as the
Administrator may deem appropriate, including requirements for registration and labeling, self-
monitoring and reporting, prohibitions, limitations, or economic incentives (including marketable
permits and auctions of emissions rights) concerning the manufacture, processing, distribution,
use, consumption, or disposal of the product."  42 U.S.C. § 7511b(e)(4).  For any given product
category EPA may either issue a national rule requiring the "best available controls," or instead
issue "control techniques guidelines" ("CTGs") "if the Administrator determines that such
guidance will be substantially as effective as regulations in reducing emissions." 42 U.S.C.
§ 7511b(e)(3)(A), (C).

"Best available controls" is a technology-based emissions standard defined as the
level of emissions reduction "that the Administrator determines, on the basis of technological and
economic feasibility, health, environmental, and energy impacts, is achievable through the
application of the most effective equipment, measures, processes, methods, systems or
techniques, including chemical reformulation, product or feedstock substitution, repackaging,
and directions for use, consumption, storage, or disposal."  42 U.S.C. § 7511b(e)(1)(A).  CTGs,
by contrast, are not binding regulations but merely "information on air pollution control
techniques" provided by EPA to the states to aid in their own regulation of air pollution under the
Clean Air Act.  States bear substantial responsibility for the implementation of the Act,
especially in "non-attainment areas" where regulations under Section 183(e) would take effect.
The information provided under CTGs includes:

> data relating to the cost of installation and operation, energy
> requirements, emission reduction benefits, and environmental
> impact of the emission control technology.  Such information shall
> include such data as are available on available technology and
> alternative methods of prevention and control of air pollution.
> Such information shall also include data on alternative fuels,
> processes, and operating methods which will result in elimination
> or significant reduction of emissions.

42 U.S.C. § 7408(b)(1).  EPA's issuance of a CTG triggers a responsibility for states to submit

emission standards for stationary sources of VOCs.  See Memorandum of Points and Authorities

in Opposition to Plaintiff's Motion for Summary Judgment and in Support of Defendant's Cross-

motion for Summary Judgment on Remedy ("Def. Opp.") at 8; Page Decl. ¶ 49; 42 U.S.C.

§ 7511a(b)(2).

       In March 1995, EPA completed its study of VOC emissions and published an

initial listing of product categories, as well as a schedule for the regulation of each category.  See

Page Decl. ¶¶ 20-21; 60 Fed. Reg. 15,267 (March 23, 1995).[6]  EPA had promulgated regulations

or CTGs for each category in the first group (Group I) by July 1999.  See Page Decl. ¶ 22.[7]

Accordingly, EPA was to have promulgated regulations for the four priority groups by March 23,

1997, March 23, 1999, March 23, 2001, and March 23, 2003, respectively.  EPA last revised its

list of product categories and groupings under Section 183(e) on November 17, 2005.  See 70

---

    [6]    EPA completed the study only after being sued by the Sierra Club and entering
into a consent decree (approved by this Court) on February 27, 1995.  See Sierra Club v.
Browner, Civil Action No. 94-0553 (D.D.C. filed Mar. 17, 1994).

    [7]    This also was accomplished only after litigation in this Court and the signing of a
consent decree.  See Sierra Club v. Browner, Civil Action No. 97-1984 (D.D.C. filed Aug. 29,
1997).

Fed. Reg. 69,759.  Fifteen categories, divided into three groups (Groups II-IV), remain

unregulated.  <u>See</u> Page Decl. ¶ 23.

### B.  History of this litigation

Starting on July 16, 2001, plaintiff the Sierra Club filed seven different complaints

against EPA, each seeking relief for EPA's alleged failure to discharge a different aspect of its

regulatory duties under the 1990 Clean Air Act.  The cases were consolidated on June 20, 2002

and then stayed while the parties sought mediation.  On May 22, 2003, the parties entered into a

partial consent decree setting a schedule for the promulgation of some of the regulations at issue.

<u>See</u> Revised Partial Consent Decree.

The parties engaged in further settlement discussions until early 2005, during

which time they provided periodic status updates to the Court.  Unfortunately, they were unable

to resolve the remaining claims, but instead filed cross-motions for summary judgment.  Plaintiff

also filed a motion to strike the declaration of Steve Page that had been filed by defendant in

support of its dispositive motion.  Defendant conceded in its briefs that it had failed to discharge

its mandatory duties under the Clean Air Act, but argued that plaintiff's proposed remedy – a

schedule for the promulgation of the rest of the regulations required by the statute – was

impracticable, and proposed a more generous alternative schedule.

Argument was heard on the motions on November 22, 2005.  On March 31, 2006,

the Court issued an Order denying defendant's motion for summary judgment, granting summary

judgment in favor of plaintiff and denying plaintiff's motion to strike.

## II. DISCUSSION

Plaintiff filed these consolidated actions to compel EPA to perform a nondiscretionary duty under the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604(a)(2).  There is no question as to liability; EPA does not contest its failure to discharge its duty under the statute.  The only controversy concerns what schedule the Court, in the exercise of its equitable discretion, should order defendants to comply with in promulgating the required regulations.

### A. Standard of Review

#### 1. Summary Judgment Standard

Summary judgment is to be granted if there is no genuine issue of material fact. FED. R. CIV. P. 56(c).  Once the moving party carries its burden of demonstrating the absence of any genuine issue of material fact, the nonmoving party must present "specific facts showing that there is a genuine issue for trial."  FED. R. CIV. R. 56(e).  The nonmovant must show that he can satisfy the burden of proof that will be put on him in the trial to support his claim.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986); Brees v. Hampton, 877 F.2d 111, 117 (D.C. Cir. 1989), cert. denied, 493 U.S. 1057 (1990).  Because defendant does not contest the issue of liability, the entry of summary judgment is appropriate, and it remains only for the Court to fashion an appropriate equitable remedy.  See NRDC v. Train, 510 F.2d 692, 705 (D.C. Cir. 1975) ("The authority to set enforceable deadlines both of an ultimate and an intermediate nature is an appropriate procedure for exercise of the court's equity powers to

vindicate the public interest."); see also Amer. Lung Ass'n v. Browner, 884 F. Supp. 345, 349

(D. Ariz. 1994) (where liability is uncontested and "it remains only for the Court, acting in its

discretion, to fashion an equitable remedy," summary judgment is appropriate); Sierra Club v.

Ruckelshaus, 602 F. Supp. 892, 898 & n.9 (N.D. Cal. 1984) (summary judgment appropriate

regarding purely equitable issue of how the court, exercising its discretionary power, should

fashion a remedy).

2.   Failure to Perform Nondiscretionary Duty

When EPA has failed to discharge a nondiscretionary duty under the Clean Air

Act, a district court has jurisdiction to compel the Administrator to fulfill it.  See 42 U.S.C.

§ 7604(a); Sierra Club v. Browner, 130 F. Supp. 2d 78, 82, 89 (D.D.C. 2001); Sierra Club v.

Ruckelshaus, 602 F. Supp. at 898.  When an agency has failed to meet the statutory deadline for a

nondiscretionary act, the court may exercise its equity powers "to set enforceable deadlines both

of an ultimate and an intermediate nature[.]"  NRDC v. Train, 510 F.2d at 705 (citing Porter v.

Warner Holding Co., 328 U.S. 395, 398 (1946)).  A court appropriately may decline to impose an

immediate deadline, however, and may afford an agency additional time for compliance, "where

it is convinced by the official involved that he has in good faith employed the utmost diligence in

discharging his statutory responsibilities."  Id. at 713.  In other words, "[t]he sound discretion of

an equity court does not embrace enforcement through contempt of a party's duty to comply with

an order that calls him 'to do an impossibility.'"  Id. (quoting Maggio v. Zeitz, 333 U.S. 56

(1948)).

Nonetheless, the district court must scrutinize carefully claims of impossibility, and "separate justifications grounded in the purposes of the Act from the footdragging efforts of a delinquent agency." NRDC v. Train, 510 F.2d at 713. When Congress expresses its intent that regulations be promulgated by a date certain, that intent is of utmost importance; a court considering a claim of impossibility must not "order a remedy that would . . . completely neutralize the mandatory nature of the statutory directive." Sierra Club v. Browner, 130 F. Supp. 2d at 95. "An equity court can never exclude claims of inability to render absolute performance, but it must scrutinize such claims carefully since officials may seize on a remedy made available for extreme illness and promote it into the daily bread of convenience." NRDC v. Train, 510 F.2d at 713.

An agency thus bears "a heavy burden to demonstrate the existence of an impossibility." Alabama Power Co. v. Costle, 636 F.2d 323, 359 (D.C. Cir. 1980) (citing NRDC v. Train, 510 F.2d at 713); see also NRDC v. Reilly, 797 F. Supp. 194, 197 (E.D.N.Y. 1992); Sierra Club v. Ruckelshaus, 602 F. Supp. at 898. That burden is especially heavy where "the agency has failed to demonstrate any diligence whatever in discharging its statutory duty to promulgate regulations and has in fact ignored that duty for several years." Sierra Club v. Thomas, 658 F. Supp. 165, 172 (N.D. Cal. 1987). When an agency has failed to meet a mandatory statutory deadline, it is insufficient for the agency to demonstrate only that it has proceeded in good faith; it also must demonstrate that it has exercised "utmost diligence" in its efforts to comply with the statute. See id. at 171 n.5 (reviewing cases); New York v. Gorsuch, 554 F. Supp. 1060, 1065 n.4 (S.D.N.Y. 1983) ("If the administrator could possibly have

complied with the statutory mandate, but did not because of competing concerns or other

decisions on his part, then he is not acting in 'good faith'").

   In <u>NRDC v. Train</u>, the D.C. Circuit recognized two possible legitimate constraints

on the agency's ability to meet a statutory deadline:

> First, it is possible that budgetary commitments and manpower
> demands required to complete the guidelines by [the existing
> deadline] are beyond the agency's capacity or would unduly
> jeopardize the implementation of other essential programs. Second,
> EPA may be unable to conduct sufficient evaluation of available
> control technology to determine which is the best practicable or
> may confront problems in determining the components of
> particular industrial discharges.

<u>NRDC v. Train</u>, 510 F.2d at 712; <u>see also</u> <u>Alabama Power Co. v. Costle</u>, 636 F.2d at 359; <u>Sierra

Club v. Thomas</u>, 658 F. Supp. at 170-71; <u>Sierra Club v. Ruckelshaus</u>, 602 F. Supp. at 898; <u>New

York v. Gorsuch</u>, 554 F. Supp. at 1064.

   The courts, however, have rejected agency claims that additional time is needed

simply to improve the quality or soundness of the regulations to be enacted.  <u>See</u> <u>Sierra Club v.

Ruckelshaus</u>, 602 F. Supp. at 899 (rejecting defendant's justification that regulations would be

improved by further study).  Courts also tend to reject as contrary to the relevant statute agency

approaches to rulemaking that sacrifice the timely implementation of the statute in favor of

extensive agency information-gathering and analysis.  For example, the United States District

Court for the Southern District of New York, in rejecting EPA's defense of its failure to

promulgate regulations required by the 1977 Clean Air Act on grounds of impossibility, stated:

> The deadlines imposed [under the 1977 Clean Air Act
> amendments], when viewed against the various statements of
> purpose, show simply that Congress concluded that prompt, though
> imprecise, regulations were preferable to no regulations during the

> period while further studies were being conducted to provide the
> Administrator with more complete information. Against this clear
> articulation of legislative intent, it is unseemly for the
> Administrator to assert that she is vested with the discretion to
> balance the need for prompt regulation against the need for
> informed standards.

New York v. Gorsuch, 554 F. Supp. at 1064; see id. at 1065 ("I suggest that this evidence does not demonstrate 'impossibility,' but rather a difference in rulemaking philosophy from that evinced by Congress."); see also Sierra Club v. Gorsuch, 551 F. Supp. 785, 788-89 (N.D. Cal. 1982) ("the EPA envisions a level of thoroughness and scientific certainty not within the contemplation of Congress at the time it mandated the regulation of hazardous air pollutants.").

Courts also turn a skeptical eye towards agency claims that competing regulatory priorities preclude compliance with statutorily-mandated deadlines.  "If Congress formulates policies and programs to meet specific problems, it may also establish their relative priority for the Nation.  In such a situation, the court's role is to enforce the legislative will when called upon to do so."  New York v. Gorsuch, 554 F. Supp. at 1062-63 (citing TVA v. Hill, 437 U.S. 153, 194 (1978)).  "EPA's generalized complaints . . . that there are competing demands on their resources, do not amount to a claim of impossibility sufficient to justify a departure from a Congressional mandate. . . . 'shifting resources in response to statutory requirements and court orders is commonplace for EPA.'"  NRDC v. Reilly, 797 F. Supp. at 197 (citations omitted) (quoting Sierra Club v. Thomas, 658 F. Supp. at 174).  To accept such an argument in the face of a congressional direction "would effectively amount to condoning a fully discretionary approach to a nondiscretionary duty."  Sierra Club v. Browner, 130 F. Supp. 2d at 95.

14

*B.  The Parties' Proposed Schedules*

1.  Section 112 Source Categories

Under the 1990 Amendments to the Clean Air Act, EPA was to have issued

emissions standards for all of the Section 112(c)(3) and 112(c)(6) source categories by November

15, 2000.  Plaintiff proposes a schedule calling for EPA to promulgate regulations for ten source

categories every six months, from June 15, 2006 to June 15, 2008.  Under plaintiff's proposal,

EPA must promulgate regulations for the source categories subject to regulation under Section

112(c)(6) by December 15, 2007.  EPA proposes a far more leisurely schedule, calling for it to

regulate four source categories by December 15, 2007, six more by December 15, 2008, and ten

more source categories every December 15 until 2012, when all remaining source categories will

be regulated.

2.  Section 183(e) Products

EPA promulgated its list of consumer and commercial products subject to Section

183(e) regulation, dividing them into four priority groups, on March 23, 1997.  See 60 Fed. Reg.

15,267 (March 23, 1997).  Accordingly, EPA was to promulgate regulations for Group I by

March 23, 1997; Group II by March 23, 1999; Group III by March 23, 2001; and Group IV by

March 23, 2003.  EPA had promulgated regulations or CTGs for Group I by July 1999.  See Page

Decl. ¶ 22.  Groups II through IV remain unregulated.

Plaintiff's proposed schedule would require defendants to:  (1) regulate one

specified category of products (flexible package printing materials) by June 15, 2006; (2) regulate

four specified categories of products by December 15, 2006; and (3) regulate the ten remaining

specified categories of products by June 15, 2007.  Defendant's proposed schedule calls for defendant to regulate the remaining product categories in three groups of five each, in two-year intervals.  Under this schedule EPA would be required to promulgate regulations or CTGs for Group II by September 30, 2007; Group III by September 30, 2009; and Group IV by September 30, 2011.

### C. The Parties' Arguments

Defendant's first argument that plaintiff's proposed schedule is "impracticable" is that compelling EPA to promulgate regulations on that timeline would result in "rules that fall short of meeting the substantive requirements of section 112(c)(6), 112(c)(3) and (k)(3)(B), and 183(e) or the applicable procedural requirements."  Def. Opp. at 12, 19 (faster schedule would require "procedural or analytical shortcuts" which "could seriously jeopardize both the soundness of the regulatory action and its legal defensibility.").  Defendant claims that it "is of paramount importance" that it be afforded sufficient time to promulgate "sound regulations that will survive judicial review."  Id. at 13 (quoting Sierra Club v. Thomas, 658 F. Supp. at 172).  EPA claims that its proposed schedule "represents the reasonable minimum time in which EPA can complete the obligations at issue [.]"  Def. Opp. at 12.

In support of its motion for summary judgment, EPA filed a declaration from Steve Page, Director of the Office of Air Quality Planning and Standards ("OAQPS"), Office of Air and Radiation ("OAR") at EPA.  Mr. Page has served in this position since 2002.  OAQPS sets national emissions standards, monitors and reports on air quality and emissions of air pollutants, and is responsible for implementing several programs under the Act.  See Page Decl.

16

¶ 1.  The Page Declaration discusses the components of the Act at issue here, and canvasses the history of regulatory actions taken by the EPA under the statute.  It describes what EPA sees as its remaining obligations and explains EPA's proposed schedule.  See Page Decl. ¶ 27.  EPA claims that the Page declaration establishes two facts:  first, that it takes, on average, approximately 50 months to promulgate a regulation governing a single category under Section 112 or 183(e); and second, that OAQPS's competing regulatory priorities preclude adherence to a faster schedule.

With respect to Section 112(c) standards, Page sets forth a "template schedule" for the promulgation of each standard.  The schedule allows 50 months for the promulgation of a standard for a single source category – a figure Page claims is "based on ESD's practical experience in issuing emission standards regulations under CAA [Clean Air Act] section 112." Page Decl. ¶¶ 33-34.  The schedule is divided into four phases:  (1) general industry characterization/survey (9 months); (2) information collection and analysis (17 months); (3) rule proposal (12 months); and (4) rule promulgation (12 months).  See id. ¶ 35.  EPA states that, between 1990 and 2003, OAQPS worked on about five area source categories each year, but that it currently is working on 30 categories and that by 2008 it will have commenced work on all the remaining source categories.  See Def. Opp. at 16; Page Decl. ¶ 57.  Page asserts that a 50-month schedule also is appropriate for the promulgation of Section 183(e) standards, proposing a "template schedule" similar to the one he proposes for Section 112 standards.  See Page Decl. ¶¶ 45-47.  If the EPA elects, however, to promulgate CTGs instead of standards based on "best available controls" under Section 183(e), Page asserts that a 24-month regulatory time frame would be adequate.  See id. ¶¶ 49-52.

As it made plain in its March 31, 2006 Order, the Court rejects these proposed regulatory timelines, as well as defendant's argument that anything faster would yield substantively or procedurally deficient rules. First, Mr. Page's 50-month proposed timelines for regulations under Sections 112 and 183 represent only his <u>retrospective</u> estimate of the average amount of time needed by EPA to promulgate a single standard. <u>See</u> Page Decl. ¶ 33 ("This schedule . . . is based on ESD's actual regulatory experience issuing both major and area source emissions standards regulations under Section 112 over the past 15 years."). The Court's primary concern here is not what EPA has (or has not) achieved in the past, but what it can reasonably be expected to accomplish going forward.

Moreover, courts evaluating claims of impossibility when an agency has failed to meet a mandatory deadline generally have rejected claims that additional time is needed to ensure substantively adequate regulations. <u>See Sierra Club v. Ruckelshaus</u>, 602 F. Supp. at 899 (not enough for agency to say "further study always makes everything better"); <u>New York v. Gorsuch</u>, 554 F. Supp. at 1065 ("While the Administrator should be commended for striving to develop the fullest possible statistical basis for any regulations she promulgates, that quest must give ground in favor of expedition where Congress expressly directs the Administrator to establish standards promptly."); <u>see Sierra Club v. Gorsuch</u>, 551 F. Supp. at 788-89 ("by calling for further elaborate study of the radionuclide emission problem and the concomitant increased use of EPA resources, the EPA envisions a level of thoroughness and scientific certainty not within the contemplation of Congress at the time it mandated the regulation of hazardous air pollutants."). The four-phase regulatory process described in the Page declaration, <u>see</u> Page Decl. ¶¶ 33-41, is indicative of "a level of thoroughness and scientific certainty not within the contemplation of Congress at the

time it mandated the regulation of hazardous air pollutants." Sierra Club v. Gorsuch, 551 F.

Supp. at 788-89.  Although in most circumstances the Court defers to agency expertise about

appropriate rulemaking procedures, such deference is inappropriate where Congress has

unambiguously expressed its intent that these regulations be promulgated by a date certain and

the agency manifestly has failed to fulfill this statutory obligation.  See Linemaster Switch Corp.

v. EPA, 938 F.2d 1299, 1303 (D.C. Cir. 1991) ("given the clarity of Congress' instruction that

[the CERCLA Hazard Ranking System] be revised no later than October 17, 1988, it would

indeed be odd to conclude that Congress implicitly entrusted a laggard agency with the authority

to devise a remedy for its own untimeliness.").

       Defendant also argues that the regulatory tasks at issue here present unique

challenges that justify the allowance of additional time.  With respect to the regulation of area

source categories under Section 112(c) and 112(k)(3)(B), defendant argues that area source

category standards are especially difficult to set rationally, for two primary reasons:  First, the

relevant data for each source category are unique, so that information gathered in one rulemaking

will not usually expedite another.  See Def. Opp. at 16.  Second, area sources pose difficulties not

encountered when regulating major sources.  For example, area sources constitute a larger and

more diverse group of smaller entities than major sources; existing research focuses on major

sources, so that less information about area sources currently exists; and it is harder for smaller

entities to respond to information requests, because they tend not to have personnel dedicated to

environmental compliance.  See id. at 21; Page Decl. ¶ 36.

       This is an insufficient basis for the Court to release EPA from its statutorily

required duty to promulgate these regulations by a date certain.  If the schedule set by the Clean

Air Act for the regulation of these sources is unreasonable, EPA's remedy lies with Congress, not

with the courts.  Amer. Lung Ass'n v. Browner, 884 F. Supp at 348 n.9 ("The EPA's relief is

with Congress, not with the courts."); NRDC v. Reilly, 797 F. Supp. at 198 ("Short of this

showing [of impossibility], EPA's proper recourse is to persuade Congress to amend the statute,

not to defy the statute and seek relief with this Court."); Sierra Club v. Thomas, 658 F. Supp.

at 175 ("In the absence of a showing of impossibility, EPA must look to Congress, not this Court,

for an extension of time.").  "[T]o grant an extension such as required by the EPA, would involve

the Court, rather than Congress, in changing, qualifying or amending . . . the unqualified,

mandatory provisions of Section 7412.  Such relief, as sought by EPA should come from the

Congress – not from the Courts."  Sierra Club v. Gorsuch, 551 F. Supp. at 789.  The Court will

not second-guess Congress's determination that it would be (or would have been) possible to

regulate these sources within the time frame set by the statute.

       Finally, EPA argues that "other mandatory obligations" preclude its compliance

with plaintiff's proposed schedule.  See Def. Opp. at 16; Page Decl ¶ 30.  Page names several

regulatory tasks for which his office is responsible under Section 112 and other provisions of the

Clean Air Act.  See id.  As plaintiff notes, however, EPA (including OAR) currently devotes

substantial resources to discretionary rulemakings, many of which make existing regulations

more congenial to industry, and several of which since have been found unlawful.  See Sierra

Club's Memorandum of Points and Authorities in Opposition to Defendant's Cross-motion for

Summary Judgment on Remedy ("Pl. Opp.") at 12-13.  Defendant's only response is that at least

some of those regulatory activities were not discretionary because they were undertaken in

response to petitions to modify the list of HAPs under 42 U.S.C. § 7412, to which EPA must

respond within 18 months under the terms of the Act.  See Reply Memorandum of Points and

Authorities in Support of Defendant's Cross-motion for Summary Judgment on Remedy ("Def.

Rep.") at 13 & n. 10 (citing 42 U.S.C. § 7412(b)(3)).

   This response is insufficient.  That some of the regulatory activities that EPA

currently is engaged in are nondiscretionary comes as no surprise, and does little to undermine

plaintiff's basic point – that it is inappropriate for an agency to divert to purely discretionary

rulemaking resources that conceivably could go towards fulfilling obligations clearly mandated

by Congress.  The will of Congress, as expressed in the Act, is that the promulgation of standards

according to these mandatory deadlines should take precedence over all other rulemaking that

EPA has not been expressly ordered to complete by Congress, as well as (arguably) over

mandatory rulemaking for which the authorizing statute does not set a date certain.[8]  See New

York v. Gorsuch, 554 F. Supp. at 1066 ("While in the normal instance I would defer to the

wisdom of the Administrator, I cannot when Congress has so clearly spoken on the issue. If the

Administrator disagrees with the burden Congress has imposed upon her Agency, her proper

recourse is to persuade Congress to amend the statute, not to defy the statute and seek relief from

the courts.").

   Despite the complexity of the regulatory scheme involved, this case devolves to a

single issue: whether defendant has met the "heavy burden" of demonstrating that it would be

---

[8]  The Court notes that many of the mandatory regulatory duties cited by defendants
in the Page Declaration involve reviewing and revising existing regulations, either on a regular
schedule or in response to petitions.  See Page Decl. ¶ 30.  Although both tasks might be
mandated by statute, the Court finds if unreasonable for EPA to devote its limited resources to
the revision of existing regulations while so many mandatory regulations remain unpromulgated,
years after the statutory deadlines have passed.

impossible to comply with plaintiff's proposed schedule for the enactment of the remaining standards.  Alabama Power Co. v. Costle, 636 F.2d at 359.  The Court finds that it has not. EPA's only justifications for seeking huge amounts of additional time – 12 years in the case of Section 112(c)(3) standards; more than eight years for Section 183(e) standards – are the asserted complexity of the regulatory tasks before it and the fact that other regulatory priorities demand resources that might be devoted to meeting EPA's obligations under the Clean Air Act.  As the Court has discussed, neither of these arguments is sufficient to excuse EPA from expeditious compliance.

Congress directed EPA in 1990 to begin executing these tasks on a specific schedule set by statute.  EPA has been grossly delinquent in making serious efforts to comply. And far from making the required showing that it has exercised its "utmost diligence" in its efforts to comply with the statutory deadlines,  Sierra Club v. Thomas, 658 F. Supp. at 171 n.5, defendant has not even attempted to justify its delinquency up to this point.  The history of regulation under Sections 112(c) and 183(e) of the Clean Air Act shows that EPA has fulfilled its statutory duties only when forced by litigation to do so.  By all appearances, EPA's failure to promulgate the required standards owes less to the magnitude of the task at hand than to "the footdragging efforts of a delinquent agency,"  NRDC v. Train, 510 F.2d at 713, or an attempt by EPA to prioritize its own regulatory agenda over that set by Congress in the 1990 Clean Air Act amendments.  It is emphatically not within an agency's authority to set regulatory priorities that clearly conflict with those established by Congress.  See New York v. Gorsuch, 554 F. Supp. at 1062-63.  EPA's justifications for seeking additional delay cannot override the clear intent of Congress (as expressed in the statute) that these duties should be fulfilled by a date certain.

All of this notwithstanding, the Court does find that plaintiff's proposed schedule is simply too compressed at this stage to afford any reasonable possibility of compliance.  See NRDC v. New York, 700 F. Supp. 173, 181 (S.D.N.Y. 1988) (recognizing "the necessity of dealing with the issues on a pragmatic basis," court allowed EPA administrator "a reasonable period of time" to comply with mandatory statutory duty); Sierra Club v. Thomas, 658 F. Supp. at 175 ("Nevertheless, since the purpose of this order is to protect the public interest and not to punish EPA, the Court would extend EPA's time to compensate for its footdragging if it were convinced that doing so was necessary for the promulgation of workable regulations.").  In particular, plaintiff's proposal that defendant be required to promulgate regulations for the first sets of source categories and product categories by June 2006 does not afford sufficient time for EPA to shift resources to regulation under Sections 112 and 183.  Rather than order the defendant to do what is likely an impossibility, see NRDC v. Train, 510 F.2d at 713, the Court finds it appropriate to order a regulatory schedule that is slightly more relaxed than that proposed by plaintiff, but significantly more expedited than that sought by the defendant.

Specifically, with respect to defendant's Section 112(c)(3) and (k)(3)(b) duties, the Court on March 31, 2006 ordered EPA to increase more gradually the number of rulemakings due at one time:  as opposed to issuing standards for ten source categories by June 15, 2006, and then ten more every six months until June 2008 (as plaintiff requests), the Court directed defendant to issue standards for four categories by December 15, 2006; six more by June 15, 2007; and then ten more categories every six months until June 15, 2009.  With respect to

regulations under Section 183(b), EPA must promulgate regulations or CTGs for Groups II, III,

and IV by September 30, 2006; September 30, 2007; and September 30, 2008, respectively.[9]

### D.  Promulgation of Standards Under Section 112(c)(6)

As the Court has discussed, EPA's mandatory duties under Section 112(c)(6) are

to identify the categories or subcategories of sources "accounting for 90 per centum or more of

the aggregate emissions of each such pollutant [listed in Section 112(c)(6)]" and to issue

emissions standards for those source categories.  42 U.S.C. § 7412(c)(6).  EPA has failed to issue

those standards, and the Court (by its Order of March 31, 2006) directed EPA to promulgate, no

later than December 15, 2007, emission standards assuring that source categories accounting for

not less than 90 percent of the aggregate emissions of each of the hazardous air pollutants

enumerated in Section 112(c)(6) are subject to emission standards under Section 112(d)(2) or

(d)(4).

With regard to discharging its duty to regulate the remaining source categories

under Section 112(c)(6), defendant proposes to do the following:

> [O]nce EPA completes emission standards for the remaining
> source categories under section 112(c)(6), it intends to issue a
> notice that explains how it has satisfied the requirements of section

---

[9]      Defendant argues that, by requiring it to set standards for *specific* source
categories and product categories by dates certain, plaintiff's proposal "would improperly compel
EPA to take action on specific categories of area sources and consumer and commercial products
based on the current lists published by EPA."  Def. Rep. at 4.  Defendant argues that granting the
proposed order would "impermissibly strip" EPA of it statutory authority to modify the list of
source categories and product categories to be regulated under Sections 112(c)(3) and (k)(3)(B),
Section 112(c)(6), and Section 183(e).  See id.; Def. Opp. at 17.  Defendant is correct – the Act
does afford it discretion to modify the lists in question; however, this warrants not denial of
plaintiff's motion, but merely a modification of its proposal so that EPA may decide in what
order it wishes to regulate the source and product categories in question.

112(c)(6) in terms of issuing emission standards for the source
categories that account for the statutory thresholds identified in
section 112(c)(6).

Def. Opp. at 19 n. 16.  In other words, defendant suggests that it may elect not to promulgate

standards directly under Section 112(c)(6), because regulations it promulgates under <u>other</u>

sections of the Act may suffice to "account[] for 90 per centum or more of the aggregate

emissions" of the pollutants listed in that section.  Instead, EPA simply may issue a notice stating

how the standards it has promulgated under other sections account for 90 percent of the

emissions of the pollutants specified in Section 112(c)(6).

Plaintiff argues that this proposed remedy is unlawful "[b]ecause Clean Air Act

§ 112(c)(6) required 'standards' by November 15, 2000, not an EPA pronouncement[.]"  Pl. Opp.

at 14.  According to plaintiff, allowing EPA to make such a pronouncement, subject only to

review after the fact by the D.C. Circuit, "is no substitute for an order from this Court ordering

EPA to complete its nondiscretionary duty by a date certain deadline."  Pl. Opp. at 14.  Plaintiff

argues that the delay involved in an appeal to (and, potentially, a remand from) the D.C. Circuit

creates the potential for "serious harm."  <u>Id.</u> at 15.

It is, however, within EPA's authority to use surrogates to regulate hazardous

pollutants "if it is reasonable to do so[.]"  <u>Mossville Envt'l Action Now v. Whitman</u>, 370

F.3d 1232, 1242 (D.C. Cir. 2004) (quoting <u>Nat'l Lime Ass'n v. EPA</u>, 233 F.3d at 637).  Plaintiff

appears to challenge implicitly the reasonableness of EPA's potential surrogates, <u>see</u> Plaintiff

Sierra Club's Reply in Support of Motion for Summary Judgment ("Pl. Rep.") at 10; however,

the United States Court of Appeals for the District of Columbia Circuit is the exclusive forum for

substantive review of EPA regulations promulgated under Section 112 of the Clean Air Act.  <u>See</u>

25

42 U.S.C. § 7607(b), (d)(1)(C), (e).  Although the Court recognizes plaintiff's legitimate

concerns about further delay – and the potentially grave health consequences of deficient or

delayed regulation of Section 112(c)(6) pollutants – it is beyond this Court's authority to tell

EPA how (as opposed to when) it must fulfill its duties under Section 112(c)(6).  As Judge

Kotelly stated in Sierra Club v. Browner:

> Under the CAA, the Court can only order EPA to take
> nondiscretionary actions required by the statute itself. . . . Notably,
> the CAA does not allow district courts to address the content of
> EPA's conduct, issue substantive determinations of its own, or
> grant other forms of declaratory relief. . . . Accordingly, the Court
> shall not grant the declaratory relief that Sierra Club seeks,
> especially since doing so would necessarily embroil the Court in an
> assessment of the substance of EPA's actions or omissions. Under
> 42 U.S.C. § 7607(b), such substantive judicial review is expressly
> reserved for the appropriate court of appeals.

130 F. Supp. 2d at 90.  Accordingly, the Court will not order EPA to issue standards for the

specific source categories EPA has identified as accounting for ninety percent of PCB emissions.

## III.  PLAINTIFF'S MOTION TO STRIKE

As noted, plaintiff moved to strike portions of the Page declaration pertaining to

Mr. Page's estimates of the amount of time required to promulgate regulations under Section

112(c).  Plaintiff argues that: (1) the declaration does not state facts within Mr. Page's personal

knowledge, but only opinions about how long rulemaking might take; (2) Mr. Page's estimates

are admissible neither as expert testimony under Rule 702 of the Federal Rules of Evidence nor

as lay opinion testimony under Rule 701; and (3) parts of the declaration are "purely conclusory,"

in that they state only what Mr. Page personally believes, unsupported by any facts.  Although (as

has already been discussed) the Court finds the Page declaration to be of limited value in

determining what an appropriate timetable for regulation might be, this does not justify striking the affidavit.  The Court therefore denied the motion to strike on March 31, 2006.

## IV.  CONCLUSION

For the foregoing reasons, the Court finds that there are no genuine issues of material fact and that plaintiff is entitled to judgment as a matter of law.  Accordingly, the Court denied defendant's motion for summary judgment, granted plaintiff's motion, and entered summary judgment for plaintiff on March 31, 2006.  The Court further concluded that ordering the defendant to promulgate regulations under the following timetable, as set forth in the March 31, 2006 Order, will best preserve the intent of Congress in enacting the 1990 Clean Air Act amendments, without calling upon defendants to do the impossible.

EPA shall promulgate standards under Section 112(d) of the Clean Air Act for those area source categories listed by EPA pursuant to Section 112(c)(3) and 112(k)(3)(B) as source categories that are necessary to meet the 90 percent statutory threshold identified in Section 112(c)(3) and 112(k)(3)(B), and for which it has not yet issued standards, as follows:

| | |
|---|---|
| 12/15/06 | 4 listed categories |
| 6/15/07 | 6 listed categories |
| 12/15/07 | 10 listed categories |
| 6/15/08 | 10 listed categories |
| 12/15/08 | 10 listed categories |
| 6/15/09 | 10 listed categories |

No later than December 15, 2007, EPA shall promulgate emission standards assuring that source categories accounting for not less than 90 percent of the aggregate emissions

of each of the hazardous air pollutants enumerated in Section 112(c)(6) are subject to emission standards under Section 112(d)(2) or (d)(4).  EPA shall retain its statutory authority to revise the list of area source categories under Section 112(c)(3) and 112(k)(3)(B).

For the three remaining Groups of categories of consumer or commercial products ("product categories") listed by EPA pursuant to Section 183(e) of the Clean Air Act, EPA shall promulgate regulations or control techniques guidelines under Section 183(e), to meet the 80 percent statutory threshold identified in that section, as follows:

| 9/30/06 | Group II |
| 9/30/07 | Group III |
| 9/30/08 | Group IV |

EPA shall retain its statutory authority under Section 183(e) to revise the product category list or product category groups.

An Order consistent with this Opinion issued on March 31, 2006.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE:  August 2, 2006

28